## RECONSTRUCTION FINANCE CORPORATION v. MARYLAND CASUALTY CO. et al.

### No. 2534.

District Court, D. Maryland.

July 6, 1938.

Semmes, Bowen & Semmes, of Baltimore Md. (by Frederick W. Brune, of Baltimore, Md.), for Maryland Casualty Co.

Edward Duffy, of Baltimore, Md., for Continental Debenture Corporation.

Bartlett, Poe & Claggett, of Baltimore, Md., by J. Kemp Bartlett, Jr., of Baltimore, Md., amicus curiae, for United States Fidelity & Guaranty Co.

Niles, Barton, Morrow & Yost, of Baltimore, Md. (by Carlyle Barton and George S. Yost, both of Baltimore, Md.), for intervener Maryland Trust Co.

CHESNUT, District Judge.

This case involves a construction of the legal papers constituting the Refunding Plan of 1933–4 affecting mortgages guaranteed by the Maryland Casualty Company. It arises from an interpleader suit in equity in which the Reconstruction Finance Corporation has paid into court the sum of $16,808.76 which is claimed by the Maryland Casualty Company and the Continental Debenture Corporation respectively. By order of court the Maryland Casualty Company has been designated the plaintiff and the Continental Debenture Corporation the defendant for the second stage of the interpleader; and the plaintiff so named has filed its formal bill of complaint asserting the basis for its claim, and the Continental Debenture Corporation as defendant has

filed its answer thereto setting up its claim. The facts of the case are embraced in a stipulation by these parties, and the case has now been submitted for decision after full argument by counsel for the respective parties and for an intervening party, the Maryland Trust Company (representing some of the holders of debentures issued by the Continental Debenture Corporation) and by counsel for the United States Fidelity and Guaranty Company as amicus curiae. There is no question as to the jurisdiction of the court, the plaintiff in the interpleader being a federal corporation and the contending claimants for the fund being of diverse citizenship, the Maryland Casualty Company being a Maryland corporation and the Continental Debenture Corporation a Delaware corporation.

The fund in controversy was created in the following way. Under a Loan Agreement dated February 28, 1934, the Reconstruction Finance Corporation (sometimes hereinafter called "R.F.C.") loaned at various times during 1934 sums of money aggregating $231,528 of principal to the Continental Debenture Corporation (hereinafter sometimes referred to as "Debenture Corporation"); which was secured by a pledge of mortgage securities owned by the Delaware Corporation in the amount at par value of principal of $701,600. It will be noted, for the reason hereinafter stated, the aggregate principal of the loans was 33% of the par value of the collateral. It was required by the R.F.C. as a condition precedent to the making of said loans, that the repayment thereof both principal and interest should be guaranteed by the Maryland Casualty Company (hereinafter sometimes referred to as the "Casualty Company"). This guaranty was evidenced by a paper dated February 28, 1934 called a "Guaranty and Pledge Agreement" by which the repayment in full of all the loans, both principal and interest, was expressly *guaranteed* by the Casualty Company. Pursuant to this guaranty agreement, the Debenture Corporation having made default in the payment of interest on the loans due on certain dates, the Casualty Company as guarantor was called upon by the R.F.C. to pay and did pay various instalments of interest maturing in 1934, 1935 and 1936, in the aggregate amount of $16,821.90. Under the Loan Agreement the R.F.C. was authorized by the Debenture Corporation, in the event of default in payment of principal and interest, to realize upon the collateral and satisfy the whole amount due to it for both principal and interest out of the proceeds thereof. On January 22, 1938, the R.F.C. did so realize and pay to itself the full amount of principal and interest then due, the interest which had accrued up to that time, in addition to the amounts previously paid by the Casualty Company being $1,688.88. Having thus satisfied its claim, principal and interest, out of the proceeds of liquidation of a part of the collateral, the R.F.C. still had in its possession mortgage securities of the face value of $277,087.90 and $32,399.60 in cash. By letter dated January 21, 1938, the Casualty Company notified the R.F.C. of its claim to be *subrogated* to all the rights of the R.F.C. against the Debenture Corporation, and particularly against the remaining pledged collateral, for reimbursement of the interest payments made by it as guarantor under its Guaranty and Pledge Agreement to the R.F.C.; but by letter dated January 28, 1938, the Debenture Corporation stated that it did not recognize the rights of subrogation claimed by the Casualty Company. The R.F.C. then filed this interpleader suit to have these conflicting claims judicially determined.

The claim of the Casualty Company is based on the well known equitable doctrine of subrogation in favor of a surety. It submits the simple proposition that having been required to pay to the R.F.C. interest which was primarily due and payable by the Debenture Corporation, it, as guarantor, is entitled (the R.F.C., the creditor, having been fully paid) to be subrogated to all the rights of the R.F.C. against the debtor and the debtor's collateral, in the absence of (a) any equitable reason to the contrary or (b) any agreement to the contrary. All counsel in this case agree that, for the purposes of the case at least, it may be assumed that the contracts and other related papers, are to be considered as having been made in Maryland, as well as the payments of interest made by the Casualty Company. It follows that the applicable law of subrogation is to be found in the statutes and judicial decisions of this State, rather than in the general law, or that of Virginia, where some of the notes given for the loans were made payable. Erie R. R. v. Tompkins, 58 S.Ct. 817, 82 L.Ed. —, 114 A.L.R. 1487, April 25, 1938; Ruhlin v. New York Life Ins. Co., 58 S.Ct. 860, 82 L.Ed. —,

May 2, 1938. This point, however, is not material in this case because there is no difference between the Maryland law of subrogation and that of the general law or of the State of Virginia upon the subject. And the proposition as above stated as to subrogation is not disputed by counsel for the Debenture Corporation. It is the clearly established law of Maryland and generally elsewhere. Orem v. Wrightson, 51 Md. 34, 34 Am.Rep. 286; American Bonding Co. v. National Mechanics' Bank, 97 Md. 598, 605, 55 A. 395, 99 Am.St.Rep. 466; Wallace v. Jones, 110 Md. 143, 146, 72 A. 769; Maryland Trust Co. v. Poffenberger, 156 Md. 200, 144 A. 249, 62 A.L.R. 546; Maryland Code, Art. 8, § 5; Prairie State National Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; Hardaway v. National Surety Co., 211 U.S. 552, 29 S.Ct. 202, 53 L.Ed. 321; Maryland Casualty Co. v. Repass, 4th Cir., 253 F. 328; Morton v. Dillon, 90 Va. 592, 19 S.E. 654; 16 Va.Law Register, 321, 327; 5 Pomeroy's Equity, 4th Ed., Par. 2343–2352.

While the Debenture Corporation does not dispute the Casualty Company's right to subrogation, when considered in connection with the loan and guaranty agreements above referred to, if they stood alone, it does earnestly contend that as the right to subrogation is equitable in nature, a comprehensive survey must be taken of other related papers and agreements. It points out that the loan and guaranty agreements were only a part of a general refunding plan affecting approximately $50,000,000 of mortgage bonds which, issued by numerous mortgage companies throughout many of the United States, had been guaranteed either directly or indirectly by the Casualty Company to the holders of the bonds. The general refunding plan originated in 1933 when, due to economic and financial conditions then and for some time theretofore prevailing, very many of these bonds and the underlying mortgages as security therefor were in default. It is said that a wholly unusual situation then existed with respect to the market value of real estate and the ability of mortgagors to meet their obligations, creating a financial emergency which threatened the ruin of the Casualty Company as guarantor of these mortgages; and that similar conditions prevailed with respect to other surety companies which had also guaranteed mortgages in a very large amount, the United States Fidelity

and Guaranty Company of Baltimore being one of the others. The situation was represented to be such that unless some financial reorganization plan was quickly adopted to afford relief to the surety companies they would be forced into liquidation and great loss would necessarily ensue not only to their stockholders but to the holders of their guaranteed mortgage bonds and of their other obligations.

To meet this emergency situation a general refunding plan was devised which gave to guaranteed mortgage bondholders of the Casualty Company and the United States Fidelity and Guaranty Company an option to (1) extend their bonds for a period of twenty years with reduction in rate of interest but guaranteed as to principal and interest by the Surety Company, or (2) surrender their then held bonds in exchange for a cash payment of 30% of the par value thereof and debentures of a new corporation in the amount of the remaining 70% of the par value of their bonds, the debentures to be backed by prorata proportion of the original mortgage securities. It was a part of the plan that the cash to pay the 30% of the par value of the old bonds was to be obtained by loans from the R.F.C. to be secured by a pledge of the mortgage collateral. To provide for the payment of a certain amount of accumulated interest on the old bonds and some part of the expenses of the refunding plan, it was provided that the total principal of the loan to be secured from the R. F.C. was to be equal to 33% of the face value of the collateral, the extra 3% to be used for interest and expenses. It ws further stated that the loans from the R.F.C. would be guaranteed as to principal and interest by the Surety Companies respectively, this condition having been required by the R.F.C. This general plan was first proposed to the holders of guaranteed mortgage bonds in a printed circular issued to them about June 7, 1933. The bondholders were requested to deposit their bonds with a depositary and to state which of the two available options they elected. About 99% of the bondholders ultimately accepted the plan and deposited their bonds. Of these about 25% elected to take option No. 1, and the others (about 75%) option No. 2.

In carrying out the plan two new separate corporations were formed in lieu of each of the former existing mortgage companies which had issued the bonds; (1)

a new so-called "bond" corporation and (2) a so-called "debenture" corporation. We are not concerned here with the first but only with the second. It may be stated however that the difference between the two was that in the first new bonds were issued in exchange for the old bonds, par for par with twenty-year maturity with reduced interest rate, both principal and interest guaranteed by the Surety Company; and the collateral was placed in the hands of a trustee for security. In accordance with the second option, with which we are here concerned, the depositing bondholders received debentures only and not bonds, and the title to the underlying mortgage securities was not vested in a trustee, but the rights of the debenture holders were defined in a "debenture agreement"; the bondholders receiving in cash 30% of the par of their bonds and certain accumulated interest, and 70% in new debentures maturing in twenty years, *guaranteed as to interest but not as to principal* by the Surety Company, and the pro rata proportion of the mortgage securities applicable to those bondholders who elected option No. 2 were pledged with the R.F.C. as security for the loans made by it to the Debenture Corporation. This general refunding plan was separately carried through by the Casualty Company with respect to the bonds (or mortgages) which it had guaranteed, and separate papers of the same substantial import are said to have been executed in carrying through the plan for the bonds guaranteed by the U.S. F. & G. Co. The latter is not a party to the case but its counsel has been heard as amicus curiae.

The Continental Debenture Corporation, is one of the two corporations organized to succeed the original "Continental Mortgage Company", to carry out the plan for its bondholders who elected to take Option No. 2. It is the contention of the Debenture Corporation in this case, that all these numerous papers and legal instruments forming a part of the whole refunding plan affecting mortgages guaranteed by the Casualty Company must be read as a whole, and that when so read it will be found there is an equity in favor of the debenture holders which justifies the court in this case in denying to the Casualty Company the ordinary right of subrogation for payments made by it as guarantor to the R.F.C. This chain of papers consists of (1) the circular of June 7, 1933; (2) the bond-

holders "deposit agreement" dated as of June 10, 1933; (3) the "debenture agreement" dated as of December 1, 1933; (4) the debentures themselves dated December 1, 1933; (5) the "prospectus" required by the then recently passed Securities Act, 15 U.S.C.A. § 77a et seq., and (6) and (7) the loan and guaranty agreements already mentioned.

The legal problem presented by this case may be simply stated. When the Casualty Company as guarantor paid in part the debt of the Debenture Corporation to the R.F.C., it prima facie became entitled by subrogation to the securities for the debt held by the R.F.C., to the extent of the payment made by the Casualty Company. The burden of proof or of persuasion is thus shifted to the Debenture Corporation to show that for some sufficient legal or equitable reason the right of subrogation in this case should be denied. It is true, as pointed out by counsel for the Debenture Corporation, that subrogation is an equitable remedy and not an absolute legal right; but it is nevertheless a thoroughly well established equitable right not to be denied except in a sound judicial discretion based on some definite adequate reason therefor. 60 C.J. 707. It is not sufficient for the Debenture Corporation to merely say that looking at the plan as a whole, and bearing in mind the *prior relationships* of the parties, it is not fair and equitable to grant subrogation in this case. There must be something more definite and specific than such a general contention to justify denial of subrogation. And in this case, as there is no suggestion of any misrepresentation, concealment or fraud on the part of the Casualty Company, to defeat the right of subrogation it is necessary to show from some one or more of the series of papers constituting the whole refunding plan, that the Casualty Company has either expressly or impliedly waived its right of subrogation, or that the payment made by it was made not really as guarantor but as a principal obligor.

In examining the provisions of the several papers constituting the refunding plan, it should be borne in mind that they are obviously elaborate instruments dealing with a complex legal and financial situation, and were evidently prepared with great and probably meticulous care by competent and experienced counsel. The magnitude of the financial interests, the geographically widely distributed location

of the very numerous mortgage companies which had issued the original bonds, the vital importance of the refunding plan to the Surety Companies, and the necessity of realizing for the mortgage bondholders the utmost possible from their investments under the circumstances, and the necessity for compliance with the detailed provisions of the new Securities Act imposed on counsel in preparation of these documents the need of great care and much professional labor. Naturally the Surety Companies, by reason of their very large commitments and the absolute necessity of the success of the plan to their continued existence, took the initiative in the matter; but the actual putting through of the plan by obtaining the assent of the mortgage bondholders necessarily required the active co-operation of the widely distributed banking and brokerage firms in many States who had sold these guaranteed mortgage bonds to the public. At the request of the Surety Companies three of these banking and brokerage firms resident in Baltimore undertook to present the matter to the mortgage bondholders as "Plan Managers", and were compensated for their services by the Surety Companies; and in this respect it may be assumed, from the legal standpoint, that they represented the Surety Companies. But in fairness it is also to be considered that they were likewise interested as a matter of ordinary business good will to see that the refunding plan was as fair as possible to their respective customers who had invested in the guaranteed mortgage bonds. It appears from the exhibits to the stipulation of facts that the legal professional work in the preparation of the series of papers constituting the plan was to some extent divided among counsel for the respective interests. Counsel for the Plan Managers took the initiative in the preparation of some of the more important papers, other than the loan and guaranty agreements referred to. But the stipulation also shows that the respective papers in their final form represented not merely a first draft but many revisions thereof, and during the course of their preparation they were examined and criticized and to some extent from time to time amended and added to by suggestions emanating from other counsel including attorneys for some of the mortgage bondholders. It is, of course, true that in a situation of this kind the individual holders of one or a few mortgage

bonds would naturally not have been in a position to have personal counsel give such comprehensive and meticulous care to the whole series of papers in the plan as was necessarily given by counsel for the Surety Companies and the Plan Managers; but there is no reason to think that the interests of the bondholders were not adequately represented and cared for in the preparation of the papers. It appears from an exhibit to the stipulation of facts that the counsel for the Plan Managers (who appear in this case for the intervenor representing a substantial amount of debentures) expressly considered that they were also, with the approval of the Surety Companies, acting in the interest of the old bondholders. While the circumstances as a whole were such that it is entirely reasonable to interpret the provisions of the several agreements liberally in the interests of the bondholders, it should not be assumed in the examination of the papers that the legal and equitable interests of the bondholders were not carefully considered in carrying out the plan. More specifically there would seem to be no reason to infer that when the plan involved a guaranty of the R.F.C. loan by the Casualty Company, the well known equitable right of subrogation of a guarantor was not within the contemplation of the lawyers who drew the papers. And indeed, as will be hereinafter pointed out, express reference to the right of subrogation of the Casualty Company as guarantor both of the interest on the debenture bonds, and on the loan, is made in the debenture agreement and guaranty agreement respectively, although in one case it is subordinated to the interests of the debenture holders and in the other to that of the R.F.C.

And in considering the whole matter it is not permissible to carry over into the interpretation of the papers constituting the refunding plan the *original* rights of the mortgage bondholders as against the Surety Company prior to the plan. All the bondholders absolutely *surrendered* their old bonds and with them the prior guarantees thereof by the Casualty Company. It was the very essence of the plan that this should be done because it was recognized that otherwise the Casualty Company would not be able to survive as a going concern. The question presently presented is, therefore, not what rights the bondholders originally had nor whether in electing Option No. 2 of the refunding plan

they unwisely made too great concessions to the Casualty Company, but only what are the respective rights *under the papers constituting the plan* which, it is conceded, was fairly consented to by the present debenture holders without misrepresentation or concealment or undue pressure of any kind from the Casualty Company.

Coming now to a closer analysis of the provisions of the papers relied on by counsel for the Debenture Corporation as constituting an equity sufficient to defeat the right of subrogation, we find that the only specific contention advanced is that the papers, other than the loan and guaranty agreement, are to the effect that the deposit and debenture agreements distinguish between the *principal* of the mortgage securities and the *income* therefrom as to the respective applications thereof. It is contended that by reason of this provision only the income from the mortgage securities could properly be applied toward the payment of *interest* on the R.F.C. loan, and that to the extent of the deficiency therein the Casualty Company was obligated as principal debtor to supplement it; and therefore, as the income from the mortgage securities was never sufficient to pay any interest to the R.F.C. (except $13.14) the Casualty Company was obligated as principal debtor to pay the same; and by reason thereof it not only is not entitled to subrogation to the extent that it has paid this interest, but is also legally obligated, in a proper proceeding, to refund to the Debenture Corporation the accumulated interest, to the extent of $1688.88 (the item above mentioned), which the R.F.C. has deducted from the principal of the mortgage securities pledged to it. It is not contended that the R.F.C. was affected by this provision requiring the allocation of income to interest; indeed the agreement expressly provided to the contrary; but it is contended that the Casualty Company with full knowledge of the provision in the debenture agreement was bound thereby despite any provision to the contrary in the loan agreements. It will be noted that this contention does not go to the extent of denying the Casualty Company the right of subrogation to the extent that it might have been required to pay a portion of the *principal* of the loan made by the R.F.C., but only denies the right as to the *interest* on the loan paid by the Casualty Company. It is not disputed by the Casualty Company

that the reimbursement for interest which it now claims by subrogation will necessarily come out of the principal of the mortgage securities. The position of the Casualty Company is, however, that none of the provisions of any of the papers singly or collectively imposed any obligation on it either expressly or impliedly to pay deficiencies of interest with respect to income, as a principal debtor, and that its present reimbursement for principal will in no way lessen the rights of the debenture holders under the agreements or take from them anything to which they are thereunder entitled.

One of the specific provisions of the papers relied upon by counsel for the Debenture Corporation is Article 4, section 3(b) and (c) of the Deposit Agreement. This agreement was made between the old Continental Mortgage Company of Baltimore, the issuer of the guaranteed bonds now transmuted into debentures of the Continental Debenture Corporation, and the Maryland Trust Company as depositary, and the bondholders of the Continental Mortgage Company. Its principal purpose was to provide for a deposit of the bonds pending the determination of the effectiveness of the refunding plan. The Casualty Company was not a party to the agreement but it is not disputed by its counsel that it was aware of its provisions. Sub-section (b) after reciting that the deposited bonds might be pledged with the R.F.C., as security for the loan, provided—"and that the income collected upon such deposited security and any other income of the corporation issuing the debentures will be applied to the operating expenses of the corporation, to repairs, taxes, insurance costs and other similar expenses, including foreclosure costs upon the properties covered by the mortgages or bonds secured thereby pledged with the Reconstruction Finance Corporation, to the interest on the Reconstruction Finance Corporation loan, and to the guaranteed interest on the debentures."

Sub-section (c) provided—"that any principal collections or amounts received in liquidation of the collateral pledged as security for the Reconstruction Finance Corporation loan will be applied first to the principal of the Reconstruction Finance Corporation loan;".

And reference is also made to the Debenture Agreement which was executed between the Continental Debenture Cor-

poration, the Casualty Company as guarantor and the Maryland Trust Company as trustee, Article III, section 2, sub-sections (2), (3) and (4) of which substantially reproduce the above quoted provisions of the Deposit Agreement, and read as follows:

"2. That the income collected by the Corporation from its assets, whether or not the same be pledged with the Reconstruction Finance Corporation, shall be applied to the operating expenses of the Corporation, repairs, taxes of every kind, insurance costs and other similar expenses (including costs of acquisition or appropriate foreclosure costs) upon properties covered by mortgages or instruments of like legal effect, titles or bonds held by the corporation, interest or expenses incident to any indebtedness of the Corporation to the Reconstruction Finance Corporation or on any obligations incurred in due course in the liquidation of its assets, interest on the debentures outstanding hereunder and to the payment of additional interest out of excess income, if any, on said debentures.

"3. That any principal, collections or amount received in liquidation of the assets of the Corporation pledged as security for any indebtedness of the Corporation to the Reconstruction Finance Corporation will be applied to the payment of the principal of the indebtedness of the Corporation to the Reconstruction Finance Corporation except that with the consent of the Reconstruction Finance Corporation, debentures issued hereunder may be accepted as provided for in the next succeeding Article IV of this Agreement.

"4. That after the repayment in full of the indebtedness of the corporation to the Reconstruction Finance Corporation, all principal collections and amounts received in liquidation of its assets shall be used only for any or all of the following purposes and within said limitations the Corporation shall designate such use, viz:"

It will be noted from these provisions that income from the securities is primarily allocated to certain expenses or fixed charges of the Debenture Corporation and that the principal of the pledged securities is allocated to principal of the loan made by the R.F.C. It is not expressly stipulated in these particular provisions that any part of the principal of the mortgage securities pledged with the R.F.C. shall be applied to interest due to the R.F.C., but it is at least implicit from sub-paragraph (4) that this might necessarily occur in the event of deficiency in income (see Perring v. Baltimore Trust Co., 171 Md. 618); and in other provisions in the papers it is expressly so provided. Thus in Article III, section 3 of the Debenture Agreement, after expressly providing for a pledge of the mortgage securities with the R.F.C., as security for the loan, it was provided: "and in the event of default with respect to said loan, income *as well as principal* collections from the assets of the (Debenture) Corporation may be applied on account of the principal of or *interest* on said loan, or both, in any manner which the Reconstruction Finance Corporation in its sole discretion shall elect." (Italics supplied.)

Section 3 containing this provision begins:

"Notwithstanding any covenants or other provisions of this Agreement, it is distinctly understood among all the parties hereto, including all of the holders from time to time of any of the debentures issued thereunder."

And in the form of debenture set out in the Debenture Agreement, and in the debentures themselves issued thereunder, in referring to the provisions of the Debenture Agreement, respecting the pledge of the mortgage securities to the R.F.C., it is recited:

"It is further provided that any principal collections, or amounts received in liquidation of the collateral pledged as security for the Reconstruction Finance Corporation loan will be applied, first to the payment of the principal of said loan. It is also provided that until the loan of the Reconstruction Finance Corporation is repaid in full the assets of the Corporation pledged as security for said loan shall be subject to the lien and all rights of the Reconstruction Finance Corporation under any agreements executed by the (Debenture) Corporation to secure such loan shall be managed, liquidated, operated, collected, settled and otherwise dealt with as directed by the Reconstruction Finance Corporation. In the event of default with respect to said loan, income as well as *principal collections* from the assets of the (Debenture) Corporation may be applied on account of the principal of or interest on said loan, or both, in any manner which the Reconstruction Finance Corporation in its sole discretion shall elect."

Consistent with these provisions the loan agreement section 6(b) provided in part:

"If and so long as there shall exist a default hereunder, the balance of the principal and/or interest so collected shall be applied on account of the principal of or interest of the liabilities, or both, in any manner that the Corporation (R.F.C.) in its sole discretion shall elect."

These express provisions for the application of principal of the mortgage securities to interest on the R.F.C. loan if necessary are consistent with the reference to such a prospective loan made in the preliminary circular which went to the bondholders which contained the following:

"And after repayment of each said loan through liquidation of such portion of the collateral as is necessary, the remaining assets will become available for the benefit of the holders of the debentures of the respective new mortgage companies."

And also in the prospectus, required by the Securities Act, which was delivered to each of the debenture holders when they received their debentures in final exchange for surrendered original bonds, was the following:

"After repayment of this loan through liquidation of such portion of the collateral as is necessary, any remaining assets will be returned to the Corporation issuing the debentures."

Furthermore both the Debenture Corporation and the debenture holders had express notice of the terms of the loan agreement and the guaranty agreement. In Exhibit A annexed to the Debenture Agreement (itself being an agreement between the old Continental Mortgage Company, the Continental Bond Corporation, the Continental Debenture Corporation and the Maryland Casualty Company dated as of December 1, 1933, but not actually executed until some time later) paragraph 8 reads as follows:

"8. Reference is made to a Loan Agreement dated February 28th, 1934, from the Debenture Corporation to the Reconstruction Finance Corporation, to a Guaranty Agreement from the Mortgage Company to the Reconstruction Finance Corporation dated February 28th, 1934, and to a Guaranty Agreement from the Guarantor to the Reconstruction Finance Corporation, dated February 28th, 1934. Copies of each of said Agreements are on file at the head office of the Trustee under the Indenture securing the bonds issued or to be issued by the Bond Corporation and at the head office of the Trustee under the Agreement pursuant to which the debentures of the Debenture Corporation are issued or to be issued, and are open to inspection during ordinary business hours by any holder or depositor of old bonds."

The argument for the Debenture Corporation is that the primary allocation in the Deposit and Debenture Agreements of income to interest, and of principal of the securities pledged to the principal of the loan, without express provision for possible application of principal of the securities to interest on the loan, read in connection with the statement in the circular and other papers that the Casualty Company would guarantee the loan, principal and interest, to the R.F.C. amounts in legal effect to an independent promise by the Casualty Company to pay, as principal debtor, any interest due on the loan not paid from income from the securities. All of this income had been applied to other expenses of the Debenture Corporation. Standing alone these provisions for allocation of principal and interest might possibly give rise to the implication contended for, but in my opinion no such inference is fairly deducible from the papers as a whole in view of the express provisions to the contrary above quoted. Nor is it at all probable in view of the very great care with which these papers evidently were drawn that the matter would have been allowed to rest on the basis of the doubtful inference if it had been the intention of any of the parties to the papers that the Casualty Company was to be required to supplement the deficiencies of income as an independent obligation. In the latter event, it seems utterly improbable that the provision would not have been expressly and clearly made somewhere in these lengthy legal documents prepared with such care and scrutinized by counsel for so many different interests. Nor am I able to find in the papers taken as a whole that there is any general equity arising from the legal situation which in connection with the doubtful inference contended for, is sufficient to deny to the Casualty Company its right of subrogation. Clearly the possibility of the exercise of such a right was not entirely overlooked. By the Debenture Agreement the Casualty Com-

pany guaranteed the payment of the interest on the debentures and in this connection its possible right of subrogation against the assets of the Debenture Corporation after the full payment of the debentures was recognized by Article 6, section 2, which reads as follows:

"Maryland Casualty Company shall not have any claim against the Corporation for any amounts paid by it under the provisions of this Agreement until and after all obligations of the Corporation to the holders of the debentures issued hereunder have been met and fully performed."

This, of course, relates to the guaranty by the Casualty Company of the payment of interest on the debentures and not the guaranty of principal and interest to the R.F.C. The only guaranty that the Casualty Company gave to the debenture holders was that of interest on the debentures and is set forth in Article VI, section 1 of the Debenture Agreement and was expressly limited as follows: "otherwise than for the payment of interest, Maryland Casualty Company shall not be liable in any manner for the obligations under the debentures."

And the debentures on their face provide:

"The obligation of said Maryland Casualty Company * * * being limited to the guaranteed interest on said debentures as set forth in the Agreement."

The possible right of subrogation of the Casualty Company for payments made by it under the guaranty and pledge agreement is recognized in Section 6 of that instrument which reads:

"The undersigned (Maryland Casualty Company) shall have no right of subrogation whatsoever in respect of the liabilities or any of the collateral securing the same unless and until the R.F.C. Corporation shall have received full payment of all the liabilities and of all obligations of the undersigned hereunder with respect to that individual debtor against whom subrogation is sought."

This, of course, restricted the Casualty Company's right of subrogation so that it could not compete with the R.F.C. in the securities pledged until after the prior full satisfaction, both principal and interest, of the R.F.C., but it imposed no limitation on the right of subrogation thereafter. Counsel for the Debenture Corporation has also referred to other particular sections of the several instruments affecting the plan, all of which references I have read

and considered, but none of them contain language of different import from the quotations above made from the papers, and, in my opinion, contain no provisions, singly or collectively, that could reasonably be construed as an obligation by the Casualty Company to pay interest to the R.F.C., to the extent of deficits in income from the securities pledged, as principal obligor, nor as a waiver of the Casualty Company's right of subrogation.

Counsel for the Maryland Trust Company as intervenor in this case advances as an argument against the allowance of subrogation here, the contention that the debenture holders of the Debenture Corporation stood, in relation to the interest owing to the R.F.C., in the position of a "quasi-surety"; and as such it is argued that they have an equity as strong as that of the Casualty Company as a true conventional surety. This argument is based on an article in 47 Harvard Law Review 976 to 1008 entitled "Some Recent Subrogation Problems in the Law of Suretyship and Insurance", which reviews some cases where in special situations a true or conventional surety has been denied subrogation against an innocent third person placed without his fault, by the wrongful action of another, in the position of a debtor (quasi-surety) to a principal creditor. The legal proposition contended for is said to be illustrated by a case "where a bailee who has given bond to return the bailment wrongfully disposes of it to a third party, the bailor may make claim directly against the third party, who acquires no title through the wrongful transfer, or may make claim against the bailee's surety. In the first instance, does the third party, who is referred to as a quasi-surety, have a right of subrogation to the bailor's claim against the conventional surety, which by express contract has assumed the risk of a default by the bailee, or, in the latter case, does the conventional surety have a right of subrogation to the bailor's claim against the third party, or quasi-surety?" Some cases are cited to the effect that in such situations where the equities are equal some courts have denied affirmative relief by subrogation under the maxim *potior est conditio defendentis*. See Washington Mechanics' Sav. Bank v. District Title Ins. Co., 62 App.D.C. 194, 65 F.2d 827; American Surety Co. v. Lewis State Bank, 5th Cir., 58 F.2d 559. No Maryland or Virginia decision is referred to in this connection. Without ex-

pressing any opinion as to the merits of the legal proposition so advanced, it is sufficient to say that if sound it can have no application to the present case because in my opinion there is no basis for analogizing the position of the debenture holders in this case to that of a quasi-surety for the debt due from the Debenture Corporation to the R.F.C. The Debenture Corporation was a direct principal debtor to the R.F.C. and is also a direct debtor to the debenture holders. The R.F.C. had a pledgee's lien on the mortgage securities for the debt due to it, and the Debenture Corporation was entitled to the equity in the pledged securities; but the debenture holders did not have even a secondary lien on the securities, although the Debenture Corporation was doubtless charged with a trust in the securities for their benefit. The debenture holders are in no sense debtors to the R.F.C. Their only legal or equitable relation to it was that both it and they were creditors of the Debenture Corporation, the R.F.C. being a secured creditor and the debenture holders unsecured. The suggested analogy also fails because there has been no wrongful act committed by anybody in this case with the result of imposing on the debenture holders as innocent third parties an obligation to the R. F.C. which they would not otherwise have incurred. The debt which has been paid and satisfied by the Casualty Company as surety was not created by any wrongful act but in pursuance of the most express and formal contracts of which the debenture holders had full notice and which indeed was the very foundation of the whole refinancing plan to which they voluntarily became parties.

In considering the situation even from the very general standpoint of fairness of the exercise of the right of subrogation by the Casualty Company, it may be noted that clearly the R.F.C. had the full and perfect right as pledgee of the collateral to resort to the principal for the interest on the loan and if it had done so, instead of calling on the guarantor to pay currently accumulating interest, its right to do so could not have been denied and is in fact admitted by the Debenture Corporation. In that event the Debenture Corporation would have been no worse off with respect to the pledged collateral than it will now be after giving effect to subrogation in favor of the Casualty Company. It is true that counsel for the Maryland Trust Company,

Trustee, as intervenor in this case, contends in that event the Debenture Corporation would have had some right of action against the Casualty Company for the amount of principal of the mortgage securities applied by the R.F.C. to the payment of its interest; but in my opinion this view, for the reasons already given, is not sustainable on any reasonable construction of the papers as a whole.

The case in essence is simply this. The main feature of the refunding plan, for those bondholders who availed themselves of option No. 2, was that they should receive accumulated interest to date on their bonds, 30% of their principal in cash and 70% in new twenty-year debentures guaranteed as to interest but not as to principal by the Casualty Company; that the accumulated interest and 30% of the principal so to be paid to the bondholders was to be obtained from a loan from the R.F.C. in the principal amount of 33% of the par value of the mortgage securities to which such bondholders were entitled, which loan was to be secured both as to principal and interest by a pledge of the mortgage securities, and the loan both as to principal and interest to be secured by the guarantee of payment thereof in full by the Casualty Company; and that after full satisfaction and payment of the loan the remainder of the securities should revert to the new Debenture Corporation to be administered by it for the benefit of the debenture holders. It has unfortunately, although hardly unexpectedly, resulted that the remainder of these securities even at par value are substantially less than the amount of the outstanding debentures, and it seems inevitable that the debenture holders will not receive full payment for the principal due them although the interest for twenty years thereon has been guaranteed by the Casualty Company. It is not suggested that this shrinkage in the value of the securities is in any way attributable to the fault of any one in carrying out the plan; but only to the inherent deficiency in value of the securities for the old bonds, which condition was indeed apparent upon the formulation of the refunding plan and the very reason for it. Viewing the plan as a whole it is clear that the alleged equities now advanced on behalf of the Debenture Corporation and the holders of its debentures as a bar to the Casualty Company's otherwise clear right of subrogation are really founded, not on the provisions of the

1018

plan itself as evidenced by the several papers comprising it, but on a comparison of the respective rights and obligations of the parties which existed *prior* to the plan, with those now existing *under* the plan. Undoubtedly the old bondholders surrendered very important legal rights against the Casualty Company by their acceptance of the refunding plan. But those who availed themselves of option No. 2 immediately obtained the cash benefit which would otherwise not have been available to them. In accepting the plan they necessarily took it with its limitations, one of which was that the only security for the ultimate payment of the principal of their debentures, representing 70% of the principal of the old bonds, was the equity in the securities pledged to the R.F.C. As guarantor of the principal and interest of the loan made by the R.F.C. on these securities, the Casualty Company is entitled to its right of subrogation as against the securities pledged. This is not denied by the Debenture Corporation or the debenture holders as to the *principal* of the loan but only as to the *interest*. I fail to find in the papers constituting the plan any sufficient legal basis for the distinction so sought to be made between principal and interest.

I therefore conclude that the fund in controversy, less the amount heretofore paid out of it in allowance to counsel for the R.F.C., in filing the interpleader proceeding, must be awarded to the Maryland Casualty Company.

A decree to that effect may be prepared and submitted by counsel after conference as to its form. As the facts have all been stipulated there is no necessity to make any findings of fact other than those admitted by the pleadings and those contained in the written stipulation.